COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-461-CV

 

 

IN THE
INTEREST OF K.W. 

AND M.A.                                                                                          

 

 

                                              ------------

 

           FROM THE
325TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

 

I.  Introduction








Appellant Natasha Mitchell, mother of K.W. and
M.A., appeals the trial court=s order
terminating her parental rights to these two children.[2]  Natasha challenges the constitutionality of
section 263.405(i) of the Texas Family Code and raises four issues challenging
the factual sufficiency of the evidence to support the trial court=s
findings that (1) termination was in the children=s best
interest, (2) she exposed the children to environmental endangerment, (3) her
course of conduct endangered the children, and (4) she engaged in criminal
conduct resulting in incarceration and the inability to care for her children
for not less than two years from the date of filing the petition.  We will affirm.

II.  Factual and Procedural Background

Natasha is the mother of K.W. and M.A.  Natasha was thirteen years old and living
with some friends when she had K.W.  She
worked cleaning houses. 

A.     Natasha Commits Assault

On July 14, 2002, Natasha committed the crime of
aggravated assault with a deadly weapon. 
Natasha assaulted her boyfriend while her children were at a neighbor=s
house.  Natasha=s
children did not see her commit the crime, but afterwards, they saw her being
taken away by the police.  Natasha claims
that the children do not remember this because they were one and two years old
at the time.  








While she was in jail, Natasha let a friend take
care of her children because she did not think that she was going to be
incarcerated for very long.  Natasha was
not able, however, to post bond; so Natasha=s friend
kept her children off and on during the three months that Natasha was in
jail.  Natasha was released from jail
after receiving probation on the assault charge.  She discovered that her children were no
longer with her friend and that her friend had given the children to another
woman.  Although this woman was Natasha=s oldest
sister=s aunt,
Natasha had never had any prior dealings with the woman. 

B.     Natasha=s
Probation Is Revoked for Drug Use

In October 2005, the trial court revoked Natasha=s
probation because she had violated the terms of her probation by using
marijuana and cocaine weekly.  Natasha
said that while she was using drugs, her children were with her sister Rillar
and her mother.  When asked if that was a
smart thing to do because her mother had served time in prison for injury to a
child, Natasha said that her mother is a changed woman now.  

C.     Natasha Places Her Children with Her Sister

While Natasha was serving time in TDC, she placed
her children with her sister Rillar. 
Prior to going to prison, Natasha had never seen Rillar use drugs and
did not have concerns about how Rillar would treat her children.  The only concern that Natasha expressed
concerning Rillar=s ability to care for her
children stemmed from the fact that Rillar does not have any children of her
own, but based on Rillar=s past conduct, Natasha had
believed that Rillar would take care of her children.  Moreover, Rillar was the person who had
turned Natasha in for violating her probation, which led Natasha to believe
that Rillar Awould do what was right by [her]
children.@ 








Natasha had been incarcerated for a month or two
when she received reports from her mother that Rillar was neglecting the
children.  Nonetheless, Natasha did not
take any affirmative steps at that point to arrange for other placement for her
children while she served her prison sentence. 

D.     CPS Receives Referral on Rillar

Kimberly Russell, a CPS investigator, testified that she
received a referral in 2005 concerning Rillar for neglectful supervision,[3]
drug use, and a lack of food for the children in Rillar=s home.  Russell learned that Rillar was keeping the
children because their mother, Natasha, was in prison. 

Russell talked to M.A., who told her that there was food in
the home but that he did not like eating ravioli.  M.A. said that he had seen his aunt (Rillar)
snorting cocaine in the bathroom.  M.A.
said that he knew what cocaine, syrup, weed, marijuana, and crack were.  K.W. did not indicate that he had seen drug
use or had been neglected. 








Another part of the referral was for medical neglect of
K.W.  When Russell first interviewed
K.W., he was limping, and she asked him to take off his shoe and sock.  She saw that his toe was bleeding and asked
him what had happened.  He said that he
had stabbed himself in the toe.  She brought
K.W.=s injury to Rillar=s attention, but
Rillar never took K.W. to get it treated. 
K.W.=s grandmother ultimately took him to the
hospital, where K.W. was diagnosed with osteomyelitis, an infection of the
bone. 

The referral also involved an allegation that M.A. and his
cousin, who was also living with Rillar, were engaging in sexual acts
together.  M.A. told Russell that Rillar
had shown him pornography involving two women engaging in sexual acts.  However, M.A. denied engaging in any type of
sexual conduct with his siblings or his cousin.

When Russell talked to Rillar, she denied the allegations
of neglect.  Russell took Rillar for a
urinalysis, and it was negative.  Rillar
said that she was tired of being accused of things and that CPS could just take
the children. 

Russell said that none of the children mentioned any abuse
by their mother.  Russell therefore
disposed of the case as Areason to believe@ against Rillar
for neglectful supervision, medical neglect, and sexual abuse involving M.A. 

E.      CPS Caseworker=s Recommendation








La Monica Thomas testified that she is the ongoing CPS
caseworker for Natasha=s children.  During one of her visits with K.W. and M.A.,
she gave them letters that Natasha had written and had to very strongly
encourage them to respond to the letters; the children expressed no interest in
the letters.  The children made
statements about Natasha=s incarceration and absence.  Thomas gathered that K.W. was used to his
mother pushing him away and not engaging in a healthy bond with him.  She was in shock about the children=s lack of response
to the letters that Natasha had sent. 

Thomas worked to identify family members who would take the
children.  She spoke with numerous
relatives, including Natasha=s uncle Rayford
Taylor, but none were willing to take the children into their homes. 

Thomas developed a service plan for Natasha that encouraged
her to follow-up with the services that she was getting in prison, to cooperate
with the Department and provide any information for her children, and to give
updates on her release date.  Thomas was
encouraged that Natasha was participating in some services while she was
incarcerated. 








Thomas said that she has no doubt Natasha loves her
children.  However, she has doubts about
Natasha=s ability to
parent her children safely and appropriately for the long term because of her
criminal activity, her lack of contact with CPS in trying to encourage a
relationship with the children, and her failure to pursue some kind of bond
with her children.  Thomas testified that
Natasha=s boys have stated
that they love their mom but that they seem very unconcerned about her.  They responded to her letters by saying, AOh, well. That=s mom. She=s just doing her
thing.@  She believes that the boys are somewhat angry
with their mom for being incarcerated. 
The boys are in therapy now to address issues in their current
situation. 

Thomas was also concerned that Natasha will not be able to
provide the long-term structure necessary to address the boys= behavioral
issues,[4]
which formed as a result of the inconsistencies they encountered while being
moved from place to place and bounced around from relative to relative.  Thomas noted that prior to her incarceration,
Natasha was actively engaged in parenting her children with the help of family
members, but currently she has lost most if not all of her family=s support. 

Thomas testified that Natasha=s desire for the
boys to remain in CPS custody was not an appropriate solution for the
boys.  Thomas believed that the boys
should have a family with whom they could begin to bond instead of being forced
to wait for Natasha to be released. 
Thomas said that CPS was actively pursuing an adoptive placement for the
boys.  Therefore, Thomas believed that it
would be in the boys= best interest to terminate Natasha=s parental rights.


 








F.       Natasha=s Plan for
Reunification

Natasha believed that she had safely and appropriately
cared for her boys in the past.  However,
she agreed that her commission of a felony offense eliminated her ability to
safely and appropriately parent her children because she is confined in TDC.  She also agreed that by knowingly using
illegal substances and risking revocation of her probation, she hampered her
ability to provide a safe and appropriate environment for her children.  She admitted that she knew that she was
putting herself and her children at risk when she engaged in criminal behavior
and that she did it anyway.  She agreed
that her sons have been exposed to a chaotic and criminal lifestyle since 2004.


Natasha testified that she loves her kids.  She said that she made a mistake and that she
is trying to better herself while she is in prison by attending Narcotics
Anonymous and Alcoholics Anonymous every Saturday, receiving her GED and
starting college prep courses, getting on-the-job training to be a cook, and
completing cognitive intervention classes to help her think through things
clearly.  After she is released, she
plans to go to Exodus Ministry, a halfway house in Dallas that she has
researched, because it provides an environment for women with children.  She has also taken steps to attend Waco
College to become a chef.  She stated
that she wants to make things up to her children for being away from them for
two years. 








Natasha also believed that her sons deserve a stable
home.  However, she
asked the court to order CPS to keep her children in its care until she is
released from prison so she could have the opportunity to again attempt to take
care of them.  She testified that it seemed
fair to ask her sons to wait for her to be released from prison because they
want to be with her and they know that she loves them.  On the day of her arrest, Natasha said that
she promised her boys things would be different when she was released from
jail.  She said that she has taken her
rehabilitation seriously and has been a good team player in the kitchen.  Therefore, Natasha testified that
she does not believe that it is in the best interest of her children to
terminate her parental rights. 

G.      Trial Court=s Ruling

After hearing the above evidence, the trial court stated,

It=s human nature, and it=s my nature, that when I=m presented with a situation where
I haven=t dealt with a person before and
they=re asking for a second chance, that
I want to give them that second chance. 
I want to believe in them.  I want
to afford them the opportunity to do better, and I think from your testimony,
that having gone to jail, that you=ve finally grown up.

 

You=re an adult now, and you recognize
your responsibilities.  You have goals
for yourself, and you have goals for your children, and I think you=ve done well, and I hope you
continue to do well because you=ve had it rough.  It=s no picnic being pregnant at 13,
and that=s indicative to me of the type of
home that you had at that time, and I think you=ve done the best that you can to
survive and to make it.

 








But
what I find with a lot of these CPS cases is that by the time I get them and by
the time I have contact with the parents for the first time, often, such as
today with you, the kids are out of time. 
They don=t have any more time to give the
parents the ability to get their act together, and although I think you=re on the road to getting your act
together, there=s still too many if=s: 
It=s if you get out in December of
2007.  It=s if you are able to maintain the
type of home that they need after that, and then there=s the if that you can do it for any
length of time.

 

I
would like to bet on you just because I want you to succeed, but my
responsibility is to these children and what I think is in their best interest,
and they don=t have any more of their youth for
me to gamble with, to bet. 

 

Thereafter,
the trial court terminated Natasha=s parental rights
to K.W. and M.A. after finding by clear and convincing evidence that Natasha
had knowingly placed or knowingly allowed the children to remain in conditions
or surroundings that endangered their physical or emotional well-being, engaged
in conduct or knowingly placed the children with persons who engaged in conduct
that endangered their physical or emotional well-being, and knowingly engaged
in criminal conduct that has resulted in a conviction of an offense and
imprisonment or inability to care for the children for not less than two years
from the date of filing the petition and that termination of Natasha=s parental rights
was in K.W.=s and M.A.=s best interest. 

 

 








H.      Post-Trial Filings

Twenty days after the judgment was signed, Natasha filed
her motion for new trial, statement of points on appeal, notice of appeal, and
affidavit of indigence.  Nine days later,
the trial court overruled Natasha=s motion for new
trial, found that she was indigent and that her appeal was not frivolous, and
appointed appellate counsel. 

III.  Section 263.405(i) And The Separation Of Powers Doctrine

In her first issue, Natasha argues that section
263.405(i) violates the separation of powers doctrine and the Due Process
Clause.  In a recent en banc decision,
this court held that section 263.405(i) is void as a violation of the
separation of powers provision of the Texas constitution.  See In re D.W., No. 02-06-00191-CV,
2007 WL 467328, at *12 (Tex. App.CFort Worth Feb.
19, 2008, no pet. h.).  We therefore
sustain Natasha=s first issue.[5]

IV.  Burden
of Proof and Standard of Review

Having held section 263.405(i) to be unconstitutional and
thus not a bar to our consideration of issues not raised in Natasha=s original
statement of points, we turn now to the merits of her second through fifth
issues.








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745,
758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547
(Tex. 2003). AWhile parental rights are of
constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  TEX. FAM. CODE ANN. '
161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20-21; In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the Texas
Department of Family and Protective Services (TDFPS) must establish one ground listed
under subdivision (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2007); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy
and is of such weight and gravity that due process requires the petitioner to
justify termination by clear and convincing evidence.  TEX. FAM. CODE ANN. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77,
83 (Tex. App.CFort Worth 2006, pet.
denied).  It is defined as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. ' 101.007
(Vernon 2002).








Accordingly, in reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a fact-finder could reasonably form a firm conviction or belief that
the parent violated section 161.001(1)(D) or (E) and that the termination of
the parent=s parental rights would be in
the best interest of the child.  C.H.,
89 S.W.3d at 28.  If, in light of
the entire record, the disputed evidence that a reasonable fact-finder could
not have credited in favor of the finding is so significant that a fact-finder
could not reasonably have formed a firm belief or conviction in the truth of
its finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108. 

V.  Factually Sufficient Evidence of Endangerment

In her third and fourth issues, Natasha argues
that the evidence is factually insufficient to establish that she endangered
her children.  TDFPS argues that there is
ample evidence to support the trial court=s
endangerment findings under sections 161.001(1)(D) and (E) of the family code.








Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex.
1996).  To prove endangerment under
subsection (D), TDFPS had to prove that Natasha (1) knowingly (2) placed or
allowed her children to remain (3) in conditions or surroundings that endangered
their physical or emotional well‑being. 
See Tex. Fam. Code Ann. '
161.001(1)(D).  Under section
161.001(1)(E), the relevant inquiry is whether evidence exists that the
endangerment of the children=s
physical well‑being was the direct result of Natasha=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. '
161.001(1)(E).  Additionally, termination
under section 161.001(1)(E) must be based on more than a single act or
omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.  J.T.G., 121
S.W.3d at 125; see Tex. Fam. Code
Ann. ' 161.001(1)(E).  However, it is not necessary that the parent=s
conduct be directed at the children or that the children actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).








Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A fact-finder
may infer from past conduct endangering the well‑being of the children
that similar conduct will recur if the children are returned to the
parent.  See In re D.L.N., 958
S.W.2d 934, 941 (Tex. App.CWaco
1997, pet. denied), disapproved on other grounds by J.F.C., 96
S.W.3d at 256, and C.H., 89 S.W.3d at 17.  Drug use and its effect on a parent=s life
and her ability to parent may establish an endangering course of conduct.  Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).

Evidence of criminal conduct, convictions, and
imprisonment prior to the birth of a child will support a finding that a parent
engaged in a course of conduct that endangered the child=s
well-being.  J.T.G., 121 S.W.3d at
133.  While imprisonment alone does not
constitute a continuing course of conduct that endangers the physical or
emotional well-being of a child, it is a fact properly considered on the issue
of endangerment.  Boyd, 727 S.W.2d
at 533-34; R.W., 129 S.W.3d at 743-44.

The record contains substantial evidence of
subsection (D) environmental endangerment and subsection (E) course of conduct
endangerment to the physical or emotional well‑being of the
children.  Because the evidence
concerning these two statutory grounds for termination is interrelated, we
consolidate our examination of it.  See
J.T.G., 121 S.W.3d at 126.








The record demonstrates that Natasha had a
history of illegal drug use.  Natasha
admitted that she had used marijuana and cocaine weekly while she was on
probation, knowing that she risked revocation of her probation and that she was
hampering her ability to provide a safe and appropriate environment for her
children.  In addition to using illegal
drugs, the record reveals that Natasha had a criminal conviction for assaulting
her boyfriend and that her children were present when she was arrested.  The record also demonstrated that Natasha
relied on others to parent her children while she was in jail, while she was
using drugs, and while she was in prison and that the people whom she chose to
watch her children often passed her children on to other people, exposed the
children to drugs and pornography, and neglected them.  Although Natasha claims that she did not know
before she went to prison that Rillar was using drugs and would neglect her
children, Natasha did not attempt to find another placement for her children
once she was alerted to the problems with Rillar=s
neglectful care of her children.








We have carefully reviewed the entire
record.  Giving due consideration to
evidence that the fact-finder could reasonably have found to be clear and
convincing, we hold that a reasonable trier of fact could have formed a firm belief
or conviction that Natasha knowingly placed K.W. and M.A. in conditions and
engaged in conduct that endangered the children=s
physical or emotional well‑being.  See
Tex. Fam. Code Ann. '
161.001(1)(D), (E); J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d
at 25; J.T.G., 121 S.W.3d at 124; In re T.J., No. 02-05-00353-CV,
2006 WL 820518, at *6 (Tex. App.CFort
Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that mother=s and
father=s
criminal history and illegal drug use provided sufficient basis to establish
environmental endangerment and course of conduct endangerment).  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
finding on environmental endangerment and course of conduct endangerment.  We overrule Natasha=s third
and fourth issues.

Natasha also challenges the factual sufficiency
of another statutory ground for termination that was alleged by TDFPS.  Only one finding under section 161.001(1) is
necessary, however, to support a judgment of termination.  Tex.
Fam. Code Ann. ' 161.001(1); In re J.J.O.,
131 S.W.3d 618, 630 (Tex. App.CFort
Worth 2004, no pet.); see also Tex. Dep=t of
Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh=g).  Accordingly, because we have held that
factually sufficient evidence exists to support the trial court=s
finding under family code section 161.001(1)(D) and (E), we need not address
Natasha=s fifth
issue.  See Tex. Fam. Code Ann. '
161.001(1); Tex. R. App. P. 47.1;
J.J.O., 131 S.W.3d at 630.

VI.  Termination Was In The Children=s Best
Interest








In her second issue, Natasha argues that the
evidence is factually insufficient to support the trial court=s
finding that termination of her parental rights was in the children=s best
interest.  TDFPS argues that there is
ample evidence to support the trial court=s Abest
interest@
finding. 

Prompt and permanent placement of the child in a
safe environment is presumed to be in the child=s best
interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  There is also
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:  (1)
the desires of the child; (2) the emotional and physical needs of the child now
and in the future; (3) the emotional and physical danger to the child now and
in the future; (4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best
interest of the child; (6) the plans for the child by these individuals or by
the agency seeking custody; (7) the stability of the home or proposed
placement; (8) the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and (9) any excuse
for the acts or omissions of the parent. 
Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).  








These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

Regarding the first factor, the children did not
testify at trial.  However, the evidence
demonstrated that Natasha had not seen her sons since October 2005, that they
were not receptive to her letters, and that they seemed angry with her for
being incarcerated.  Thomas testified
that there is not a good bond between Natasha and her boys; however, Natasha claimed
that there was a good bond and that their love for one another was mutual. 

Regarding the second factorCthe
children=s
present and future physical and emotional needsCThomas
testified that the boys do not have any health concerns or medical problems
that would preclude them from being adopted. 
However, Thomas said that the boys have some behavioral issues that will
require some structure and a therapeutic environment that she does not believe
would be present if the boys went back to Natasha after her release.  The boys are currently in therapy to address
their anger with their mother and other issues. 








The environmental endangerment and endangering
course of conduct discussion above addressed the third, fourth, and eighth
factorsCthe
present and future physical and emotional dangers to the children, as well as
Natasha=s
parenting abilities, or lack thereof, and her acts and omissions.

Concerning the fifth factor, Natasha attempted to better herself
while in prison by attending Narcotics Anonymous and Alcoholics Anonymous every
Saturday, receiving her GED and starting college prep courses, getting
on-the-job training to be a cook, and completing cognitive intervention
classes.  After she is released, she
plans to go to Exodus Ministry and to attend Waco College to become a chef.  

Regarding the parties= plans
for the childrenCthe sixth factorCNatasha
testified that she is not in a position at this moment to care for her children
because she is in prison.  Natasha would
like CPS to keep her children in its care until she is released from prison to
see if she is able to take care of them.  She
believes that it is fair to ask her sons to wait for her to be released from
prison because she knows that they want to be with her and that they know she
loves them.  Therefore,
she
does not believe that it is in the best interest of her children to terminate
her parental rights because she is bonded with her children. 








CPS requested that Natasha=s parental rights
be terminated because doubts existed concerning Natasha=s ability to
safely and appropriately parent her children for the long term due to her
criminal activity, her lack of contact with CPS in trying to encourage her
relationship with the children, her failure to pursue a stable bond with her
children, and her lack of family support. 
Thomas believes that the boys deserve to have a family with whom they
can begin to bond instead of waiting for Natasha to be released.  Thus, CPS is actively pursuing an adoptive
placement for the boys. 

Regarding the stability of the proposed placementCthe
seventh factorCthe evidence demonstrated that
terminating Natasha=s parental rights would allow
CPS to pursue adoptive placements for the boys, which would allow them to have
the stability lacking in their current situation.

Finally, concerning the ninth factorCany
excuse for the parents= acts or omissionsCNatasha
admitted that she made mistakes and that she was attempting to turn her life
around while she was in prison.








Although Natasha argues that the children could
have remained in CPS care without resorting to termination, the trial court heard
testimony from Thomas, the children=s
ongoing CPS caseworker, that termination of Natasha=s
parental rights was in the children=s best interest
to allow them to be adopted and to have a stable home.  Giving due consideration to evidence that the
fact-finder could have reasonably found to be clear and convincing, and based
on our review of the entire record, we hold that a reasonable trier of fact
could have formed a firm belief or conviction that the termination of Natasha=s
parental rights would be in the children=s best
interest.  See In re S.M.L., 171
S.W.3d 472, 480 (Tex. App.CHouston
[14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed
that termination of father=s
parental rights was in child=s best
interest where, among other factors, father was incarcerated at time of
termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
best-interest finding.  We overrule
Natasha=s second
issue.

VII.  Conclusion

Having sustained Natasha=s first
issue, but having overruled her second through fourth issues and not reaching
her fifth issue, we affirm the trial court=s order
terminating her parental rights to K.W. and M.A.

 

 

SUE
WALKER

JUSTICE

 

PANEL F:  DAUPHINOT, HOLMAN, and WALKER, JJ.

 

DELIVERED: February 28,
2008











[1]See Tex. R. App. P. 47.4.





[2]Natasha had other
children, but K.W. and M.A. are the only children involved in this appeal.  Moreover, the fathers of K.W. and M.A. also
had their parental rights terminated, but the fathers are not involved in this
appeal.





[3]In December 2005, police picked up
the children because they were walking down the street at 8 p.m. unsupervised.





[4]Thomas testified that the children have parents and
grandparents who have been incarcerated; that they have been exposed to drugs,
prostitution, and pornography; and that M.A. knows that his father raped his
grandmother. 





[5]Because of our
disposition of Natasha=s first issue, we need
not address the subissue that she raises regarding whether section 263.405(i)
violates the Due Process Clause.  See
Tex. R. App. P. 47.1; D.W., 2007 WL 467328, at *12 n.99.